## AT A CIRCUIT COURT HELD AT FRANKLIN FOR VENANGO COUNTY, OCTOBER 1806.

CORAM—YEATES, JUSTICE.

# Lessee of William Clemmins *against* Philip Gottshall and Robert Johnston.

A survey made for an actual settler though out of possession will be received in evidence. The correct idea of an improvement before the American revolution. It corresponds with the definition of a settlement in the act of assembly of 30th December 1786.

[Clemmins's Lessee *v.* Gottshall et al.]

EJECTMENT for 400 acres and 131 perches of land in Sugar Creek township.

The case appeared on the evidence as follows :

David Meade, William Johnston, and the aforesaid William Clemmins and Robert Johnston entered into a written agreement at Cussewago, on the 26th December 1794, whereby it was stipulated, that Meade should discover unappropriated lands and make surveys thereon ; the other parties were to find all hands and provisions for chain carriers and blazers, and to build good cabins, at least 12 feet square, on each tract ; and Meade was to have one third of the tracts, and the other parties the remainder, to be ascertained by ballot or lottery.   Meade to receive 20s. for surveying two-thirds of the land, for each tract.

In pursuance thereof in January 1795, 13 tracts were discovered and surveyed, and a cabin was built on the lands in dispute, which served as a place of rendezvous.   The allotment of the different *tracts was made by mutual consent before the [*331 several improvements were completed ; and the premises in question, with two adjoining tracts, were assigned to Clemmins, by the particular desire of the two Johnstons.   They proceeded to erect their cabins in the spring following ; but they deserted their lands and separated, on hearing of the murder of two of the inhabitants by the Indians in June 1794, at the mouth of Little Concatt creek.   In the close of the same summer, Clemmins came out with another person, and did some work on the two adjoining tracts, but none on that in controversy, and returned in the fall to Westmoreland county.   In 1795, he sold his interest in three tracts to one Patterson for 300 dollars. Some of the witnesses testified, that he acknowledged to them to have received part of the purchase money, and obligations for the remainder.   Clemmins married in April 1796, and during that spring came out with Patterson and gave him possession.   The latter resided and worked on the tract about three months, when he left it much embarrassed, and never returned, the land lying vacant.   During this spring, Clemmins improperly obtained the possession of a tract of land above Meadville, claimed by one Magoffin, but an ejectment having been commenced against him, he quitted the same, and sold to John Davis.   He afterwards stopped at the improvement of Richard Vansickel, known by the name of Wentworth's tract, and seized on the possession of it as vacant, but his goods were thrown out of the cabin.   In August or September 1796, he passed through Meadville with his wife, and two loaded horses, and took possession of the lands in dispute.   They again went back to Meadville with their horses, and returned to the cabin with other loads.   They had their provisions, blankets and household articles about them, and continued in the cabin a few days, and then returned to Westmoreland county, being in want of fodder tor their cattle.   The wife also was pregnant, and alledged, she could not obtain the necessary assistance in the unsettled state

[Clemmins's Lessee *v.* Gottshall et al.]

of the country; but he declared his determination to return to the lands. He put a lock on the door of his cabin, and left a number of his household articles therein. In March or April 1797, the cabin was consumed by fire, either by accident or design, and Johnston, one of the defendants, was then seen employed in cutting house logs near thereto. In June following, Clemmins being under an engagement to reap grain seven miles from Greensburgh, sent out his wife and infant child with her father, to take possession of the lands in question; she carried with her a horse loaded with provisions, bed clothes, and family necessaries, with money to purchase more. She came to the land and required the possession thereof, but the same was refused to her by Robert Johnston, *who alledged, she had \*332] no house there. She then went with her father to Meadville, where she was afterwards joined by her husband. He likewise demanded the possession of the premises from Robert Johnston, but was denied the same by him. The latter continued in possession for some years until he sold to Thomas Russel, with a covenant to make him a good title. Russel afterwards sold to Gottshall. Clemmins became greatly indebted, and was obliged to leave the country for some time. The present ejectment was brought to June term 1806, at which time a house, one end of a barn, and a spring house were built, and 13 acres of land cleared.

In the course of the trial, a survey was offered in evidence on the part of the plaintiff, made for him on the 11th February 1806, by Samuel Dale, the deputy surveyor of the district, under his actual settlement. This was objected to, as the 8th section of the act of 3d April 1792, 3 St. Laws 311, authorizes surveys in the cases only of settlers actually in possession of the lands at the time of application to the deputy surveyor. The plaintiff should have applied for an order of the Board of Property whereon to found his survey.

The plaintiff's counsel answered, that if this construction of the law was correct, no person defrauded of his possession as an actual settler, before he had obtained a survey, could ever receive redress. It is well known, that unless a *caveat* be filed, the Board of Property will not give an order of survey in the case of settlements. But the language of the act is in the past tense: " The deputy surveyor of the proper district shall, upon " the application of any person who has made an actual settle- " ment and improvement, &c., survey and mark out the lines " of the tract," &c. Ejectment is a possessory action; and this court has determined, that an official survey must precede the recovery by an actual settler.

*Per Cur.* The survey must be read in evidence. Whether there was such an actual settlement by the lessor of the plaintiff as would authorize the survey under all the circumstances of

the case, must in the sequel of the cause come before the court and jury for their decision.

The counsel on both sides fully addressed the jury. YEATES, J. afterwards observed to them, that the case presented three several questions for decision.

1st. Whether the lessor of the plaintiff could be considered at any time as an actual settler.

*2dly. Whether he had forfeited such claim.

3dly. Had he been guilty of laches in not bringing this suit earlier.          [*333

The opinions entertained in the country after the passing of the act of 3d April 1792, as to improvement cabins, were highly erroneous. The great object of the law was to encourage the settlement of the country and the cultivation of the soil, by the hardy and sturdy yeomanry. Preference was given to persons who were willing and desirous to settle and improve the lands north and west of the Ohio and Allegheny; but it was indispensably necessary, that they should unite both characters. Hence it results, that the cabins built on the thirteen tracts gave no efficient pre-emption right to the lands thereby intended to be secured, but operated as scare-crows to keep off others, who entertained the delusive popular ideas of fancied improvements. A settlement in its nature possesses the characteristic features of improvement; but the converse of the proposition is not true.

The 9th section of the act of 3d April 1792, prescribes the duration of the settlement, the extent of the improvement, and the period within which it shall be made; but it does not define what a settlement is. 3 St. Laws 212. For this definition we must recur to the act of 30th December 1786, 2 St. Laws 487, which declares, "that by a settlement shall be understood an "actual, personal, resident settlement, with a manifest intention "of making it a place of abode, and the means of supporting a "family, and continued from time to time, unless interrupted "by the enemy, or by going into the military service of this "country during the war." It corresponds with the correct idea of what was called an improvement, before the American revolution. The *animus residendi* in the first instance, and the *animus revertendi*, in the case of evacuating the possession for a temporary purpose, were deemed of the essence of a *bona fide* improvement. The girdling of a few trees, or mauling of rails, without unequivocal intentions of residence, and return to the premises to make it a place of permanent abode, were not dignified with that character. But a man, who had erected his cabin, sowed the land, enclosed a field, or made any other preparation which clearly evinced a full determination to make the place his home and immediate settlement, might with safety leave the land in order to bring out his family, or to perform other acts of duty or charity; and, provided he returned within a reasonable time, his possession was secured to him. If he

stayed away an unreasonable time, he would be presumed to have abandoned his original intention of settlement ; but this, like other presumptions, might be repelled by proof.   It would be incumbent on him to account for his long absence in a satis-
*334]  factory *manner.   Sickness or other inevitable accident on such occasions, have always been considered as suffi-cient excuses for such delay in returning.

Patterson appears to have been the first actual settler on the lands in question.   He resided on and worked the land near three months.   But he abandoned the tract and never returned. In the language of the act of December 1786, his settlement was not continued from time to time.

Clemmins, the lessor of the plaintiff, succeeded to the vacant possession.   But to him it has been objected that he had sold the tract, and received at least a part of the consideration ; and further, that he was then pursuing other objects of speculation, in possessing himself of Magoffin's and Wentworth's tracts, above and below Meadville.   To this it is fairly answered, that the claim of Patterson was wholly forfeited by his abandonment, and that he, or any other on his behalf, never returned to the land ; in consequence thereof, any person desirous of settling and improving, might lawfully enter on the possession ; and the former possessor being indebted to him for the premises, was a strong equitable circumstance in his favour.   No impropriety of conduct as to the two tracts of land about Meadville, can invali-date his pretensions to the lands in question.   Subsequent to those transactions he resumed the possession of this tract, with his wife, and had no other home.   Every thing he possessed in the world was contained within the logs of his cabin.   I abomi-nate the practice, which has prevailed in this new country, of slipping into the possessions of others, who, in many instances, have been necessitated to quit their settlements for temporary purposes ; and have frequently, during my present circuit, ex-pressed my decided sentiments on that subject.   It is absurd in the extreme to suppose that the legislature, who enacted the law of 3d April 1792, ever intended to confine actual settlers within the lines of their 400 acres, as if they were enclosed by the four walls of a prison.

To the jury it belongs to decide, whether, when Clemmins took possession of this tract in August or September 1796, he did not shew " a manifest intention of making it a place of abode " and the means of supporting a family."   If they shall be of opinion, from a careful review of all the circumstances, that such was the bent and settled purpose of his mind at the time, then he must be considered as possessing the incipient right of an actual settler.   It is the intention unequivocally shewn, not the extent of the improvement, which stamps the reality of an actual settlement in the first instance.

If the jury shall determine in favour of the plaintiff upon the

[Clemmins's Lessee *v.* Gottshall et al.]

*first point, they must then decide whether the claim has been forfeited.

They will judge of the grounds of his discontinuing the possession in the fall ; the want of fodder for his cattle, and the fears of his wife in her pregnancy, on account of the thinness of the settlement ; they will also determine whether he absented himself an unreasonable time.

Clemmins expressed his intentions of returning to different persons at various times : he left most of his property in the cabin, and he placed a lock on the door. His cabin was burnt early in the spring of 1797, which might have come to his knowledge ; when his wife with his father demanded possession in June following, her child was but two months old : and he frequently afterwards repeated his demand on Robert Johnston before he instituted his ejectment. The presumed abandonment is negatived by all his acts ; but the period of his absence for nine months constitutes the chief objection against him.

The case seems contradistinguished as between the present parties, from common instances of dereliction. Is it consistent with justice, after the agreement of December 1794, under which the premises were assigned to Clemmins, at the instance of Robert Johnston and his brother, that the said Robert should infer an abandonment of the land without the most cogent proof ? This agreement forms a strong part of the plaintiff's case.

Yet if the plaintiff has been guilty of laches, whereby innocent persons have been injured, he ought to be postponed. If valuable improvements have been made on the land through ignorance of his claim, and monies paid by purchasers for which they can have no redress, the poverty of Clemmins will not avail him for not having brought this suit for ten years. But here the claim was fully known to Robert Johnston, one of the original parties to the agreement : he made the chief improvements on the land, and is responsible for the goodness of the title, nor has it appeared in evidence, that either Russel or Gottshall have paid any part of the consideration money. The objection on the ground of laches, does not seem to hold in the present instance against the plaintiff's recovery.

The jury found a verdict for the plaintiff.

Messrs. S. and A. W. Foster and Farrely, *pro quer.*

Messrs. Hunter and Marlin, *pro def.*

Cited in 20 W. N. C. 507 in support of the proposition that abandonment includes both the intention to abandon and the external act by which that intention is carried into effect. Intent is the essence of the act, and therefore the facts are in each particular case for the jury.